## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

AMANDA ALEXANDER and
JOSEPH REMALIA,

      Plaintiffs,

v.

                                     Case No. 2:24-cv-00618-MIS-GBW

RICHARD LOPEZ, CARLOS
VALENZUELA, and LARRY REUTER,

      Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants Richard Lopez and Carlos Valenzuela's Motion for Summary Judgment ("Motion"), ECF No. 27, filed February 18, 2025. Plaintiffs Amanda Alexander and Joesph Remalia failed to timely respond.[1] Upon review of the Motion,

---

[1] Pursuant to the Local Rules of Civil Procedure, Plaintiffs had fourteen days—until and including March 4, 2025—to file a Response. See D.N.M.LR-Civ. 7.4(a) ("A response must be served and filed within fourteen (14) calendar days after service of the motion." (emphasis added)). Plaintiffs filed a Response on March 24, 2025. See ECF No. 29. They did not move for an extension of the March 4, 2025 deadline, or file a notice pursuant to Local Rule 7.4(a) that all Parties had agreed to an extension. See D.N.M.LR-Civ. 7.4(a) (stating that a filing deadline "may be extended by agreement of all parties. For each agreed extension, the party requesting the extension must file a notice identifying the new deadline and the document (response or reply) to be filed" (emphasis added)). However, counsel for the officers did not file a motion to strike the Response as untimely, and the Court did not strike the Response at that time.

Plaintiffs having filed their Response on March 24, 2025, the officers had until and including April 7, 2025 to file a Reply. See D.N.M.LR-Civ. 7.4(a) ("A reply must be served and filed within fourteen (14) calendar days after service of the response." (emphasis added)). The officers filed a Reply on April 10, 2025. ECF No. 33. They did not move for an extension of the April 7, 2025 deadline, or file a notice pursuant to Local Rule 7.4(a) that all Parties had agreed to an extension. See D.N.M.LR-Civ. 7.4(a) (stating that a filing deadline "may be extended by agreement of all parties. For each agreed extension, the party requesting the extension must file a notice identifying the new deadline and the document (response or reply) to be filed" (emphasis added)). On April 14, 2025, the Court issued an Order striking the Reply as untimely.

Thereafter, counsel for the officers filed a Notice of Agreed Upon Extension stating that Plaintiffs' counsel agreed to extend the deadline for the officers to file their reply to April 11, 2025. ECF No. 36. On April 15, 2025, counsel for the officers filed an Unopposed Motion to Vacate Court's Order Striking Defendants' Reply to Plaintiffs' Response to County Defendants' Motion for Summary Judgment ("Motion to Vacate"). ECF No. 38. Neither the Notice of Agreed Upon Extension nor the Motion to Vacate mention that Plaintiffs' Response was also untimely. See ECF Nos. 36, 38. The Court denied the Motion to Vacate on the grounds that regardless of whether Plaintiffs' counsel

the record, and the relevant law, the Court will **GRANT IN PART AND DENY IN PART** the Motion.

## I.   Background[2]

On the evening of June 17, 2021, Plaintiffs and several of their friends (collectively, "Plaintiffs' group") were at an isolated property that Plaintiffs own in Veguita, New Mexico, shooting firearms at an abandoned and vacant mobile home.  Compl. ¶¶ 14-15, ECF No. 1.  Around 9:00 pm that evening, two officers with the Socorro County Sheriff's Office—Defendants Lopez and Valenzuela ("the officers")—arrived at the property.  Id. ¶¶ 4-5, 16.  "Upon arrival, the Officers parked their vehicle at a distance of about sixty-to-seventy five yards from where Plaintiffs and their friends were congregating around a pickup truck."  Id. ¶ 18.  "Within approximately ten-seconds after arriving at the property, Defendants Lopez and Valenzuela opened fire upon Plaintiffs and the group of people standing around them–discharging several rounds of lethal ammunition into the dark of night."  Id. ¶ 20.  A bullet struck an oxygen tank in the pickup truck, causing the oxygen tank to explode, and "engulfing Plaintiffs and their friends in a ball of fire."  Compl. ¶ 21.

On June 17, 2024, Plaintiffs instituted this lawsuit, filing a Section 1983 Complaint for the Violation of Constitutionally Protected Rights against Officer Lopez, Officer Valenzuela, and Agent Larry Reuter with the New Mexico State Police.  See id. at 1.  Relevant here, Count I alleges

---

agreed to an extension of the reply deadline, the officers failed to inform the Court of such an extension by timely filing a Rule 7.4(a) notice of agreed-upon extension.  ECF No. 39.

On April 30, 2025, counsel for the officers filed a Motion to Strike Plaintiffs' Response, arguing that Plaintiffs' Response brief was filed twenty days after the deadline prescribed in Rule 7.4(a), and Plaintiffs' counsel neither moved for an extension of the response deadline nor filed a notice of agreed-upon extension.  ECF No. 40.  Thus, counsel for the officers argued that "[t]he equal application D.N.M.LR-Civ. Rule 7.4(a), and of this Court's reasoning requires that this Court strike Plaintiffs' Response Opposing Summary Judgment For County Defendants Lopez And Valenzuela on March 24, 2025[.]"  Id. at 3.  The Court agreed and granted the officers' Motion to Strike the Response.  ECF No. 46.  Consequently, only the Motion for Summary Judgment is properly before the Court.

[2]      Unless otherwise noted, the information contained in this section is gleaned from the Complaint and is included solely to frame the issues raised by Officers Lopez and Valenzuela's Motion.

a Fourth Amendment claim for excessive use of force against Officers Lopez and Valenzuela, id. ¶¶ 33-39, and Count II alleges a Fourteenth Amendment claim for excessive use of force against Officers Lopez and Valenzuela, id. ¶¶ 40-47.[3]

On February 18, 2025, Officers Lopez and Valenzuela filed the instant Motion for Summary Judgment, arguing that (1) Count II should be "dismissed" because Plaintiffs' claims are properly analyzed under the Fourth Amendment, not the Fourteenth Amendment, ECF No. 27 at 7,[4] and (2) they are entitled to qualified immunity as to Count I because they did not violate Plaintiffs' clearly established rights, id. at 7-10.  Plaintiffs failed to timely respond.

## II.    Legal Standards

### a.    Rule 56

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the nonmovant is required to point the court to record evidence of facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  Id. at 248.  "An issue is 'genuine' if there is sufficient evidence on each side so that

---

[3]    Count III alleges a Fourth Amendment claim for false arrest and false imprisonment against Agent Reuter.  The Court granted Agent Reuter's Motion for Summary Judgment on Count III.  See ECF No. 37.

[4]    The officers did not file a motion to dismiss Count II.

3

a rational trier of fact could resolve the issue either way."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment.  See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 649 (10th Cir. 1988).  Rather, the nonmovant must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment."  Johnson v. Mullin, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998)).

However, a court may not enter summary judgment simply by virtue of the non-movant's failure to respond.  See Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002).  The Tenth Circuit has explained that

> a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. The district court must make the additional determination that judgment for the moving party is "appropriate" under Rule 56. Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. By failing to file a response within the time specified by the local rule, the nonmoving party waives the right to respond or to controvert the facts asserted in the summary judgment motion. The court should accept as true all material facts asserted and properly supported in the summary judgment motion. But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment.

Id. (citations omitted).  Thus, where, as here, the nonmovant fails to timely respond, the Court must still ensure that the evidence produced in support of the motion for summary judgment establishes "that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law. If it has not, summary judgment is not appropriate, for '[n]o defense to an insufficient showing is required.'"  Id. (alteration in original) (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 161 (1970)).

4

It is not the court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment.  See Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 627 (10th Cir. 2012), abrogated on other grounds by Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024).  Rather, the court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999); see also Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative."  Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted).

### b.      Qualified immunity

The doctrine of qualified immunity protects government officials sued in their individual capacity from liability for monetary damages unless their actions violate a "clearly established" statutory or constitutional right.  City of Escondido v. Emmons, 586 U.S. 38, 42 (2019) (quoting Kisela v. Hughes, 584 U.S. 100, 104 (2018)).  A right is clearly established only when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he [or she] was violating it."  Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014).

"A plaintiff can demonstrate that a constitutional right is clearly established 'by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits.'"  Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006)).  "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."  District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal citations and quotation marks omitted).  Although the plaintiff is

not required to identify a case "perfectly on-point[,]" Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015), "existing precedent must have placed the statutory or constitutional question beyond debate." Kisela, 584 U.S. at 104 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).  Clearly established law cannot be defined "at a high level of generality"; rather, it must be particularized to the facts of the case.  Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Quinn, 780 F.3d at 1005 (quoting Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007)).  The dispositive question is whether the unlawfulness of the official's actions was apparent in light of pre-existing law.  See Creighton, 483 U.S. at 640.

When a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established." Kapinski v. City of Albuquerque, 964 F.3d 900, 905 (10th Cir. 2020) (quoting Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011)).  The court may address these two inquiries in any order.  Pearson v. Callahan, 555 U.S. 223, 236 (2009); McCowan v. Morales, 945 F.3d 1276, 1282 (10th Cir. 2019).  If the plaintiff fails to satisfy either part of the test, the court must grant qualified immunity.  McCowan, 945 F.3d at 1282 (quoting Est. of Ceballos v. Husk, 919 F.3d 1204, 1212-13 (10th Cir. 2019)).  If the plaintiff succeeds, then—and only then—does the defendant bear the traditional burden of the movant for summary judgment.  Kapinski, 964 F.3d at 905 (quoting Koch, 660 F.3d at 1238).

### III.    Facts[5]

On June 17, 2021, Plaintiffs and their friends—Dean Gross ("Dino"), Destany Watkins, and an individual known only as "Boxer"—were at an isolated property in Veguita, New Mexico where they were shooting firearms at an abandoned and vacant mobile home.  Defs.' Facts ¶¶ 1-2, ECF No. 27; see also Suppl. Report of Agent Andre Billingsley, ECF No. 24-2 (stating that Dean Gross is also known as "Dino").  This conduct was reported by Crystal Richardson who called 911 to report that a white truck had driven by her residence and three individuals were shooting at a residence.  Defs.' Facts ¶ 3, ECF No. 27.

After Ms. Richardson's 911 call, Officers Lopez and Valenzuela were dispatched to Plaintiffs' property.  Id. ¶ 4.  Upon arrival, Officers Lopez and Valenzuela placed a spotlight on Plaintiffs' group and announced their presence.  Id. ¶ 5.  They got out of their vehicle and "screamed that they were cops."  Id. ¶ 19.

Shortly thereafter, a shootout ensued, and "[a]t some point, the vehicle located next to the Plaintiffs blew up."  Id. ¶¶ 6-7, 10.  Ms. Alexander ran away from the sound of gunshots, id. ¶ 14, but Mr. Remalia grabbed her and threw her to the ground, and jumped down himself, id. ¶ 24.

Ms. Alexander later admitted that she observed Dino point his firearm at Officers Lopez and Valenzuela and stated that she believed Dino discharged his firearm at the officers before they returned fire.  Id. ¶¶ 11-12.  Mr. Remalia observed that Dino appeared to have cocked or cleared his firearm before the explosion happened, but is not sure whether Dino shot his gun.  Id. ¶¶ 22-23.  Dino was subsequently charged with aggravated assault upon a peace officer for his conduct on June 17, 2021.  Id. ¶ 8.

---

[5]    The following facts are gleaned from the officers' Statement of Undisputed Material Facts, which is incorporated in the officers' Motion.  ECF No. 27 at 3-6 ("Defs.' Facts").

Neither Plaintiff was shot, and neither had visible injuries during their post-incident videotaped interviews.  Id. ¶¶ 15, 25.

## IV.    Discussion

Officers Lopez and Valenzuela initially argue that claims of excessive force prior to an arrest are actionable under the Fourth Amendment, while claims of excessive force brought by a pretrial detainee are actionable under the Fourteenth Amendment.  Mot. at 7, ECF No. 27.  They argue that because "there are no allegations that the County Defendants had any contact with the Plaintiffs following their arrest[,] . . . the Plaintiffs' claims in Count II, brought under the Fourteenth Amendment, fail[.]"  Id.

The Court agrees.  The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."  Graham v. Connor, 490 U.S. 386, 395 (1989).  See also Est. of Booker v. Gomez, 745 F.3d 405, 419 (10th Cir. 2014).  Claims of excessive force "brought by a 'pretrial detainee'—one who has had a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest'"—are analyzed under the Fifth or Fourteenth Amendment.  Est. of Booker, 745 F.3d at 419 (alterations in original).  And "claims of excessive force involving convicted prisoners arise under the Eighth Amendment."  Id. (citing Porro v. Barnes, 624 F.3d 1322, 1325-26 (10th Cir. 2010)).

Here, Plaintiffs allege that the officers used excessive force prior to any arrest; they do not allege that the officers used any excessive force after arrest.  See Compl. ¶¶ 14-22.  Accordingly,

Count II—which is brought under the Fourteenth Amendment—fails as a matter of law, and the Court grants the officers' Motion as to Count II.[6]

As to Count I, Officers Lopez and Valenzuela argue that they did not use excessive force in violation of the Fourth Amendment.  Mot. at 8, ECF No. 27.  They argue that their use of force was reasonable because the undisputed facts establish that Plaintiffs' group was committing a fourth-degree felony with firearms—specifically, shooting at a dwelling in violation of N.M. Stat. Ann. § 30-3-8(A), see id. at 1—and that the officers were in danger at the time they used force, id. at 8-9.  The officers argue that they are entitled to qualified immunity because (1) Plaintiffs are unable to demonstrate that their rights were violated, and, in any event, (2) there is no precedential case law holding that "an individual's rights are violated when they fired a weapon at a law enforcement officer and the law enforcement officer returned fire."  Id. at 9-10.

For the reasons that follow, the Court finds that: (1) Plaintiffs had a clearly established constitutional right to be free from the use of deadly force if the officers lacked probable cause to believe that there was a serious threat of serious physical harm to themselves or others; and (2) genuine issues of material fact exist as to whether the officers had probable cause to believe that there was a serious threat of serious physical harm to themselves or others before they used deadly force.

### a.    Clearly established right

If the officers lacked probable cause to believe that someone in Plaintiffs' group posed a threat of serious physical harm, either to the officers or to others, and nevertheless used lethal force to seize them, they violated Plaintiffs' clearly established constitutional rights.  See Zia Tr. Co. ex

---

[6]    In their stricken Response, Plaintiffs "consent[ed] to entry of summary judgment in favor of . . . Defendants Lopez and Valenzuela as to Count II[,]" ECF No. 30 at 1

rel. Causey v. Montoya, 597 F.3d 1150, 1155 (10th Cir. 2010) ("Viewing the record in the light most favorable to the plaintiffs, we have already determined that Officer Montoya did not have 'probable cause to believe that there was a serious threat of serious physical harm' to himself or others.  As such, Officer Montoya violated clearly established law when he used deadly force against Megan Causey." (internal citation omitted)).

      **b.**     **Constitutional violation**

The Fourth Amendment guarantees citizens the right to be "secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV.  To bring a claim for an unlawful seizure through excessive force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that the seizure was unreasonable.  Thomas v. Durastanti, 607 F.3d 655, 663 (10th Cir. 2010).

Here, Officers Lopez and Valenzuela do not argue that no seizure occurred.  See generally Mot. at 8-10.  Therefore, the Court will assume for purposes of the Officers' Motion that it is undisputed that a seizure occurred, and will focus its analysis on whether the officers' seizure of Plaintiffs was unreasonable.

Whether force is unreasonable under the Fourth Amendment requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. 386, 396 (1989).  Courts accomplish this balancing function by undertaking an objective inquiry which asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397 (citing, inter alia, Scott v. United States, 436 U.S. 128, 137-39 (1978)); see also United States v. Salas-Garcia, 698 F.3d 1242, 1248 (10th Cir. 2012).  Specific factors relevant to the unreasonable force inquiry

are: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  Graham, 490 U.S. at 396.  Of these three "Graham factors," the second is generally the most important to determine if a use of force was reasonable.  Palacios v. Fortuna, 61 F.4th 1248, 1256 (10th Cir. 2023) (citing Est. of Valverde ex rel. Padilla v. Dodge, 967 F.3d 1049, 1060 (10th Cir. 2020)).  However, these factors are "nonexclusive and not dispositive" because "the inquiry remains focused on the totality of the circumstances."  Id.

Courts judge the reasonableness of force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Palacios, 61 F.4th at 1256 (quoting Graham, 490 U.S. at 396).  In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Kisela, 584 U.S. at 103 (quoting Graham, 490 U.S. at 396-97).  Additional factors relevant to the excessive force inquiry are whether the officers' own conduct during the seizure unreasonably necessitated their use of force, whether the officers were in danger at the precise moment they used force, and the mentally ill or disturbed condition of the suspect.  Ceballos, 919 F.3d at 1214 (citing, inter alia, Hastings v. Barnes, 252 F. App'x 197, 203 (10th Cir. 2007) and Giannetti v. City of Stillwater, 216 F. App'x 756, 764 (10th Cir. 2007)).

Officers' use of lethal force is not unreasonable under the Fourth Amendment if officers "ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others[.]"  Kisela, 584 U.S. at 103 (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)); Ceballos, 919 F.3d at 1213 (stating that "officers are not justified in using deadly force unless objectively reasonable officers in the same position 'would have had probable cause to

believe that there was a threat of serious physical harm to themselves or to others'" (quoting Thomson v. Salt Lake County, 584 F.3d 1304, 1313 (10th Cir. 2009))).  When the Court assesses "whether a suspect poses an immediate threat permitting the use of deadly force, [it] consider[s] the totality of the circumstances from the perspective of a reasonable officer."  Est. of Taylor v. Salt Lake City, 16 F.4th 744, 765 (10th Cir. 2021).

Applying these principles, the Court finds that genuine issues of material fact preclude summary judgment in favor of the officers.  The Court notes at the outset that its inquiry into the objective reasonableness of the officers' use of deadly force is severely hindered by a lack of evidence regarding what the officers knew (or reasonably believed) before arriving at Plaintiffs' property and what they observed after they arrived.  See Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015) (stating that a court must determine whether force was objectively reasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time" (emphasis added)); id. at 399 ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer" (emphasis added)); cf. McFarland v. Childers, 212 F.3d 1178, 1186 (10th Cir. 2000) ("Probable cause to make an arrest exists 'if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" (emphasis added) (quoting Jones v. City & County of Denver, 854 F.2d 1206, 1210 (10th Cir. 1988))).  The officers have not filed affidavits attesting to the facts and circumstances within their knowledge when they arrived at the scene, or to what they observed before the shootout began.  With this in mind, the Court turns to the Graham factors.

### a.    Severity of the crime at issue

The first factor a court considers in assessing whether the officers' use of force is reasonable is the severity of the crime at issue.  Graham, 490 U.S. at 396.

The officers cite no evidence indicating that before the first shot was fired the officers knew (or reasonably believed) that Plaintiffs' group had committed a crime.  Although it is undisputed that before the officers arrived on the scene Plaintiffs were shooting guns at a mobile home, see Defs.' Facts ¶ 1, the officers cite no evidence that they were aware of that fact when they arrived on the scene.

The Court cannot consider the information Crystal Richardson provided to the 911 dispatcher when she called to report gunfire at Plaintiffs' property because there is no evidence regarding what information from that 911 call the dispatcher relayed to Officers Lopez and Valenzuela.  See Kingsley, 576 U.S. at 399 ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer").  Presumably, Officers Lopez and Valenzuela knew when they arrived at Plaintiffs' property that Plaintiffs' group was shooting guns at a mobile home, but the officers cite no evidence of this.

Because there is no evidence that the officers knew (or reasonably believed) that Plaintiffs' group had committed a crime, this factor weighs against a finding that the use of deadly force was reasonable.  See Wright v. City of Euclid, 962 F.3d 852, 867 (6th Cir. 2020) (concluding that the severity of the crime factor weighed against a finding of reasonableness because the officer lacked probable cause to believe the plaintiff had committed any crime at all).

> **b.    Whether the suspects posed an immediate threat to the safety of the officers or others**

The second (and most important) factor a court considers when assessing the reasonableness of the officers' use of force is whether the suspects posed an immediate threat to the safety of the officers or others.  Graham, 490 U.S. at 396.

In assessing the degree of threat facing the officers, a court considers several sub-factors, including, but not limited to: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."  Est. of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008).

> **1.    Whether the officers ordered the suspects to drop their weapons and compliance with police commands**

The officers do not argue that they ordered Plaintiffs' group to drop their weapons.  The body camera video of the incident reveals that the officers did not order Plaintiffs' group to drop their weapons when they arrived on the scene before the shootout occurred.  In fact, there is no evidence that the officers even knew that anyone in Plaintiffs' group was in possession of weapons when they arrived on the scene.

Furthermore, the video of the incident shows that before the shootout began, at least one member of Plaintiffs' group was complying with the officers' commands, walking towards the officers with their hands in the air.  The video does not show anyone in Plaintiffs' group failing to comply with the officers' commands.

Accordingly, this factor weighs against a finding that Plaintiffs' group posed a serious threat to the safety of the officers.  See Pauly v. White, 874 F.3d 1197, 1216 (10th Cir. 2017)

(finding this factor supported the plaintiffs where the officer did not order the suspect to drop his weapon).

> ### 2.    Whether any hostile motions were made with a weapon towards the officers

The Court finds that genuine issues of material fact exist as to whether any hostile motions were made with a weapon towards the officers.  In this regard, the officers assert that Dino pointed his gun at the officers, see Defs.' Facts ¶ 11, and someone in Plaintiffs' group fired their weapon at the officers before the officers "returned fire," see id. ¶¶ 5-7, 9, 11.  Without question, an individual pointing or firing a gun at an officer is a "hostile motion."  See Est. of Valverde, 967 F.3d at 1061 ("Drawing the gun to fire at an officer is a hostile motion[.]").

The officers rely on four pieces of evidence to establish that hostile motions were made: (1) a narrative of the incident prepared by Defendant Larry Reuter, a New Mexico State Police agent, after watching body camera videos of the incident ("Narrative"), id. ¶ 5; (2) Ms. Alexander's videotaped post-incident interview (which has been lodged with the Clerk of Court, who has provided it to the Undersigned), id. ¶¶ 11-15; (3) Mr. Remalia's videotaped post-incident interview (which has been lodged with the Clerk of Court, who has provided it to the Undersigned), id. ¶¶ 16-25; and (4) a video of the incident taken from one of the officers' body cameras (which has been lodged with the Clerk of Court, who has provided it to the Undersigned), id. ¶¶ 6-7.

> ### A.    Narrative

To the extent that the officers seek to use the Narrative of the incident to establish that someone in Plaintiffs' group made a hostile motion with a weapon towards the officers, the Court finds that it is impermissible hearsay.  The Narrative states, in relevant part:

> 00:26 Lt. announces "everyone walk towards me."  I observe a guy pop his head up quickly by the driver's side door, followed by a sound of a gun shot, observe Lt. drop his flashlight and <u>return fire</u> towards the pickup truck.

ECF No. 27-1 at 1 (emphasis added).

Federal Rule of Evidence 801(c) defines "hearsay" as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Generally, hearsay is inadmissible at trial, <u>see</u> Fed. R. Evid. 802, but there are several exceptions to the rule against hearsay, <u>see</u> Fed. R. Evid. 803, 804.  At the summary judgment stage, the Court may consider hearsay if "the evidence may ultimately be presented at trial in an admissible form."  <u>Argo v. Blue Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006).

Here, Officers Lopez and Valenzuela are attempting to introduce the Narrative to prove that someone from Plaintiffs' group fired their gun at the officers before the officers "returned fire."  <u>See</u> Defs.' Facts ¶¶ 5-7.  Therefore, it is inadmissible at the summary judgment stage unless (1) an exception to the rule against hearsay applies or (2) the statements made in the Narrative may ultimately be presented at trial in an admissible form.

Police reports may fall under the hearsay exception for records of a regularly conducted activity—also known as the "business records exception"—espoused in Rule 803(6).  <u>See, e.g.</u>, <u>Walker v. Spina</u>, No. CIV 17-0991 JB\SCY, 2018 WL 6519133, at *12 (D.N.M. Dec. 11, 2018) ("Police reports recording officers' observations, but not third parties' statements, may be admissible under rule 803(6).").  Under that rule, the following is not excluded by the rule against hearsay:

A record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). Here, the officers have not shown by the testimony of the custodian or other qualified witness, or by a proper certification, that the conditions of Rule 803(6)(A)-(C) are satisfied in this case. Fed. R. Evid. 803(6)(D). Because the officers have not established a proper foundation for the Narrative, the business records exception does not apply, the Narrative constitutes inadmissible hearsay, and the Court cannot consider it at this stage unless the statements made in the Narrative may ultimately be presented at trial in an admissible form. See State Farm Fire & Cas. Co. v. Amazon.com, Inc., 525 F. Supp. 3d 753, 756-57 (N.D. Miss. 2021) (finding that the business records exception did not apply because the plaintiff failed to authenticate the record under Rule 803(6)(D)); In re Lyman Good Dietary Supplements Litig., 17-CV-8047 (VEC), 2020 WL 3414927, at *5 (S.D.N.Y. June 22, 2020) (same).

The Court concludes that the statements made in the Narrative cannot ultimately be presented in admissible form at trial. Again, the officers are attempting to use Agent Reuter's Narrative of the video to prove that someone from Plaintiffs' group fired a gun before the officers "returned fire." Defs.' Facts ¶¶ 5-7. Rule 1002, known colloquially as the "best evidence rule," states: "An original writing, recording, or photograph is required in order to prove its content

unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Agent Reuter's Narrative of the video violates this rule to the extent the officers seek to use it to prove the contents of the video. See Bard v. Brown County, Case No. 1:15-cv-643, 2018 WL 11357533, at *4-5 (S.D. Ohio Dec. 31, 2018) (finding that an investigator's written interpretation and "commentary" of videos were inadmissible hearsay and violated the best evidence rule). For these reasons, the Court will not consider the Narrative.

### B.    Post-incident Interviews

The officers cite Plaintiffs' post-incident interviews to establish that Dino pointed his gun at the officers and that someone in Plaintiffs' group fired a weapon before the officers fired theirs. See Defs.' Facts ¶¶ 11-12, 22-23.

The Court finds that Ms. Alexander's statement that she observed Dino point his firearm at the officers is irrelevant because there is no evidence that the officers saw Dino point his firearm at them. Indeed, there is no evidence that the officers knew that anyone in Plaintiffs' group was in possession of a firearm—the officers did not file affidavits, and the video of the incident does not depict anyone pointing or otherwise possessing a firearm. Therefore, the Court cannot find that Dino pointing a gun at the officers is relevant to the "the totality of the circumstances from the perspective of a reasonable officer."[7] Est. of Taylor, 16 F.4th at 765 (emphasis added).

---

[7]    Even assuming Ms. Alexander's observation that Dino pointed a gun at the officers is relevant to the totality of the circumstances from the perspective of a reasonable officer—even though there is no evidence the officers saw Dino point or otherwise possess a gun—her statement is inconclusive on the issue. During her interview, the following exchange occurred:

Officer 1:    So what happened after [the officer's] truck comes to the property?

Ms. Alexander:    It pulls up. It has its brights on. Nobody says anything. They put a spotlight out. And I think Joseph, like, kind of turned around and they were asking, like, who it is, who is it. And I think Dino pulled up his rifle, or whatever. You know what I mean? Like to [inaudible]. I don't know. And then shots started going.

On the other hand, statements regarding who fired their gun first are relevant to the Court's inquiry because a reasonable officer at the scene could reasonably perceive gunfire.  Although the Court finds Plaintiffs' statements regarding gunfire are relevant, the Court also finds that they are inconclusive on the issue.  In this regard, Ms. Alexander stated during her interview: "I think [Dino] shot once and then [the officers] shot. . . . He shot at them once, and then they shot back." Alexander Interview at 56:20 - 56:35.  However, Ms. Alexander equivocated.  Shortly after she made this statement, the following exchange occurred between Ms. Alexander and the interviewing officers:

Officer 1:    So Dino asked them who they are, [the officer] spotlights them, and then Dino fires a shot.

Ms. Alexander:        [nods head]

Officer 1:    Is that correct?

Ms. Alexander:        Yeah.

Officer 1:    Okay so then, after Dino fires a shot, then what happens?

Ms. Alexander:        Then I think they shot back.

---

Officer 2:        So when you say he pulled up his rifle did he pull it up, like, to show it?  Like here, I have a rifle? Or did he pull it up to point it.

Ms. Alexander:    I don't know.

Officer 1:        So, like . . .

Ms. Alexander:    I mean, I don't know.

Officer 1:        Stop saying you don't know because that's . . . you do know.  Okay?  You're thinking that by telling us you don't know that you're going to, like, make this conversation go quicker.  Like, you . . .

Ms. Alexander:    It looked like he could have been pointing it.

Officer 1:        Okay, see, now . . . that makes sense.  Okay?

Alexander Interview at 48:43 – 49:57 (emphasis added).  Construed in the light most favorable to Plaintiffs, Dino did not point his gun at the officers.

Officer 1:          Is that what you heard or saw?

Ms. Alexander:          Yeah.

Officer 1:          You don't seem certain.

Officer 2:          Are you sure that Dino shot first?

Ms. Alexander:          I'm not sure, my back was turned.  But he's the one who pulled the gun out first.  I'm just assuming 'cause I don't know.

Officer 1:          We want to know the truth.  We want to know what you know.  That's why we're asking.

Ms. Alexander:          That's what I know.

Officer 2:          If you don't know something just say that you don't know.

Ms. Alexander:          I don't know.

Officer 2:          So who shot first?

Ms. Alexander:          I don't know.

Id. at 57:10 – 57:57.  Viewed in the light most favorable to Plaintiffs, Ms. Alexander's interview does not establish that Dino (or anyone else in Plaintiffs' group) fired first.

During his interview, Mr. Remalia also could not say definitively whether anyone in his group shot first:

Officer:          Earlier you were like, "Dino shot in the air and then the explosion happened."

Mr. Remalia:          Yeah, well that's what I said.  Out of my peripherals, like I saw him, I don't know whether he shot in the air or what he did.  But I saw him maybe cock his gun or something [inaudible].  Maybe he cleared his gun or….

Officer:          Yeah but a gun shot sounds different than an explosion, right.  So what did you hear first.  Did you hear a gun shot and then the explosion or how did that . . . .

20

> Mr. Remalia:        I don't remember what I heard. I only remember seeing out of my peripherals either him cock it or clear it. And I assume he was clearing it and then all of a sudden the big explosion happened. So, he could have shot it though. I really don't know. It happened too fast for me to have been a clear indication of him shooting and then, it was like almost the same time as [inaudible]. But there was a time when he really cleared it or cocked it, so….

Remalia Interview at 40:44 - 41:38. Viewed in the light most favorable to Plaintiffs, Mr. Remalia's interview does not establish that Dino (or anyone else from Plaintiffs' group) fired first. Rather, in the light most favorable to Plaintiffs, Mr. Remalia's statement suggests that an officer fired a gun at Plaintiffs' group causing the oxygen tank to explode while Dino was cocking or clearing his gun. See id. However, as previously stated, the officers cite no evidence that they saw Dino (or anyone else in Plaintiffs' group) cocking, clearing, or otherwise possessing a gun; therefore, the Court cannot consider this as part of the circumstances giving rise to probable cause that would justify the use of deadly force. See Kingsley, 576 U.S. at 399 ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer").

In sum, the Court finds that Plaintiffs' post-incident interviews do not conclusively establish that anyone in Plaintiffs' group made a hostile motion with a weapon toward the officers, or that the officers reasonably perceived such a hostile motion, before the officers fired their guns.

### C.    Body camera video

The officers cite the body camera video of the incident to establish that someone in Plaintiffs' group fired their weapon before the officers "returned fire." Defs. Facts ¶¶ 5-7. The Court has reviewed the video and finds that reasonable minds could differ as to who fired first.

The video is grainy and taken at twilight, so the picture is not very clear. The video begins with an officer ("Officer 1") driving up to Plaintiffs' property, but because the camera is at chest

level the video only depicts the steering wheel and sky, not Plaintiffs' group, the mobile home, or the pickup truck.  Approximately ten seconds into the video, Officer 1 parks and opens his door, revealing the mobile home and pickup truck; the pickup truck appears to be about thirty yards from where Officer 1 parked.  About fifteen seconds into the video, the other officer ("Officer 2") says: "Police, Sheriff's Department."  About eighteen seconds into the video, Officer 1 closes his car door and says: "Everybody in the vehicle get your hands up."  Officer 2 says: "Everybody in the vehicle, let me see your hands."  Officer 2 does not appear in the video, and it sounds like he is several yards away from Officer 1.  After that, at least one person in Plaintiffs' group appears with their hands in the air, walking from behind the pickup truck toward Officer 1; it appears that a second person with their hands in the air is walking behind that person from behind the truck, but because of the poor video quality it is hard to say definitively.  Officer 1 then says: "Everybody walk towards me."  At that point, about twenty-six seconds into the video, two things happen: (1) it appears that a head pops up from behind the truck bed and (2) a popping noise—possibly gunfire—sounds from somewhere ("the popping sound").  Officer 1 drops his flashlight and starts firing toward Plaintiffs' group.  The video does not show anyone in Plaintiffs' group in possession of a gun, and does not establish who fired their weapon first.

Based on the foregoing, the Court finds that genuine issues of material fact exist as to whether someone in Plaintiffs' group made a hostile motion with a weapon toward the officers before the officers fired their weapons.  The evidence reflects that at least five people at the scene of the incident had guns: Officer 1, Officer 2, Ms. Alexander, Dino, and Boxer.  See Remalia Interview at 23:25 – 23:50; 35:40 – 35:45; 37:25 – 37:33; 37:48 – 38:21; 39:45 – 39:49.  Assuming arguendo that the popping sound was, in fact, gunfire, it did not come from Officer 1; when Officer 1 shoots it is unmistakable on the video.  However, based on the evidence presented to the Court,

a reasonable juror could conclude that the popping sound was gunfire from Officer 2, someone in Plaintiffs' group, or from a neighboring property,[8] or that the popping sound was not gunfire at all.

### 3.    The distance separating the officers and the suspects

The next sub-factor in assessing the threat facing the officers is the distance separating the officers and suspects.  Est. of Larsen, 511 F.3d at 1260. It appears from the video that the officers were approximately thirty yards from Plaintiffs' group.  Under the facts of this case, this factor weighs neither for nor against reasonableness.

### 4.    The manifest intentions of the suspect

The final sub-factor in assessing the threat facing the officers is the manifest intensions of the suspects.  Est. of Larsen, 511 F.3d at 1260.

The Court finds genuine issues of material fact exist on this issue.  There is no evidence that anybody in Plaintiffs' group manifested any intentions prior to the first shot being fired.  The video of the incident shows at least one person, possibly two people, from Plaintiffs' group complying with the officers' directives, walking toward the officers with their hands in the air.  Nobody makes any threats or hostile motions.

However, if the first shot was fired by someone in Plaintiffs' group, this factor would weigh in favor of reasonableness because it would manifest an intention to hurt the officers; on the other hand, if the first shot was fired by one of the officers, this factor would weigh against reasonableness.  The Court cannot make this finding on the record before it.

In sum, the Court finds that genuine issues of material fact exist regarding the threat facing the officers.

---

[8]    Ms. Alexander stated during her interview that it sounded like the initial shot came from "behind us."  Alexander Interview at 51:25, 51:58 – 51:59.

      c.      **Whether the suspect was actively resisting arrest or attempting to evade arrest by flight**

The final <u>Graham</u> factor the Court considers in assessing the reasonableness of force is whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  490 U.S. at 396.  In this regard, the officers argue that "[t]he fact that the Plaintiffs and or [sic] their friends were discharging their firearms at the [officers] demonstrates that they were actively resisting the [officers]."  Mot. at 8.

There is no evidence that anyone in Plaintiffs' group was attempting to evade arrest by flight when the officers began shooting, and genuine issues of material fact exist as to whether someone in Plaintiffs' group fired their weapon before the officers fired theirs.  If someone in Plaintiffs' group fired first, this factor weighs in favor of a finding of reasonableness; if the officers fired first, it weighs against a finding of reasonableness.  The Court cannot make this finding on the evidence before it.

## V.      Conclusion

For the foregoing reasons, the Court finds that on the scant evidence before it, genuine issues of material fact exist as to whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them.  <u>See</u> <u>Cavanaugh v. Woods Cross City</u>, 718 F.3d 1244, 1253 (10th Cir. 2013) (holding that the district court properly submitted to the jury the question of whether the officer used excessive force because "[a]s a general matter our cases hold that, where there are disputed issues of material fact, the question of reasonableness underlying a Fourth Amendment violation is for the jury"); <u>cf.</u> <u>Bruner v. Baker</u>, 506 F.3d 1021, 1028 (10th Cir. 2007) ("[W]here there is a question of fact or 'room for a difference of opinion' about the existence

of probable cause, it is a proper question for a jury, even though it is normally determined by a court during the warrant application process.").

Accordingly, it is **HEREBY ORDERED** that the County Defendants' Motion for Summary Judgment, ECF No. 27, is **GRANTED IN PART AND DENIED IN PART** consistent with this Order; and specifically, it is **GRANTED** as to Count II and **DENIED** as to Count I..

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE